UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 1:01cr10266 NG |
| v. | ) | |
| DAVID G. STERN, | ) | VIOLATIONS:<br>18 U.S.C. § 1341 (Mail Fraud)<br>18 U.S.C. § 1343 (Wire Fraud)<br>18 U.S.C. § 2 (Aiding and Abetting) |
| Defendant. | ) | |

**INDICTMENT**

I hereby certify on 7/11/07 that the foregoing document is true and correct copy of the
☐ electronic docket in the captioned case
☐ electronically filed original filed on
☒ original filed in my office on 7/18/01
Sarah A. Thornton
Clerk, U.S. District Court
District of Massachusetts
Deputy Clerk

The Grand Jury charges that:

GENERAL ALLEGATIONS

1. At all times material to this Indictment, Defendant DAVID G. STERN (hereafter, "STERN") was an individual who resided at 29 Woodbine Road, Belmont, Massachusetts.

2. At times material to this Indictment, STERN was an attorney licensed to practice law in the Commonwealth of Massachusetts.

3. At times material to this Indictment, STERN provided legal representation to a client named Dvorah Nagiel (hereafter, "Nagiel") in a divorce action then pending in the Commonwealth of Massachusetts.

4. At times material to this Indictment, Nagiel received financial payments from her former husband in connection with the settlement of her divorce action.

5. Following Nagiel's divorce settlement, STERN contacted Nagiel and informed her of an investment opportunity that was supposedly available through a pension fund manager that STERN knew at BayBank (hereafter, the "BayBank fund"). STERN stated, among other things, that he intended to invest money in the BayBank fund himself and that if Nagiel wished to

participate in the BayBank fund as well, she should give her money to him. STERN stated that the investment would be held in his name and that he would write personal checks to Nagiel for the dividends generated by the investment.

6. On or about January 10, 1996, Nagiel gave STERN two $10,000 checks to be invested in the BayBank fund. Over the course of the next six months, STERN periodically contacted Nagiel to inform her of further opportunities to invest in the BayBank fund. In response to these solicitations, Nagiel gave STERN four additional checks to be invested in the BayBank fund. The total amount of the checks that Nagiel gave to STERN between January, 1996 and July, 1996 for investment in the BayBank fund was $200,000.

7. In a letter to Nagiel dated June 10, 1996, STERN confirmed "the current status of those funds which you [Nagiel] asked me to invest." The letter set forth, inter alia, the interest payments due on the invested amounts.

8. In a second letter to Nagiel dated July 30, 1996, STERN again confirmed "the current status of those funds which you [Nagiel] asked me to invest as of August 1, 1996." STERN's second letter also set forth, inter alia, the interest payments due on the invested amounts.

9. Beginning on or about June 10, 1996, STERN began sending Nagiel checks representing the interest payments supposedly generated by Nagiel's investment in the BayBank fund. The amount of each check ranged from $1,250 to $3,750. Stern sent the checks to Nagiel via United States Postal Service mail.

10. Contrary to his statements to Nagiel, STERN never invested Nagiel's funds in the BayBank fund, if such an investment fund ever existed. Instead, STERN deposited Nagiel's

checks into his personal and law firm bank accounts and spent the money on a variety of expenses.

11. In or about June, 1997, STERN contacted Nagiel regarding a second investment opportunity. STERN stated that the second opportunity involved a gold certificate being offered by a friend of STERN's named Alan Sugar. STERN stated, among other things, that his family intended to invest one million dollars in the certificate and that as a "favor" to Nagiel, STERN was offering her the opportunity to join them for $250,000.

12. On or about June 25, 1997, Nagiel gave STERN a $250,000 check for this gold investment. At or about the same time, Nagiel received a letter from Alan Sugar at First Fidelity Surety, Inc., dated June 24, 1997, confirming that Nagiel had been "assigned an undivided 25% interest in gold certificate G01025AU." Sugar sent the letter to Nagiel as the result of a telephone call made by STERN to Sugar requesting that the letter be sent.

13. Contrary to STERN's representations, however, there was no gold, and Nagiel had no enforceable ownership interest in any certificate. The gold certificate referenced in Sugar's June 24, 1997 letter (No. G01025AU) listed Sugar's company, First Fidelity Surety, Inc. as the registered owner; stated on its face that First Fidelity had no right to transfer ownership in the certificate excerpt pursuant to the terms set forth in the certificate; and also stated on its face that the certificate did not grant First Fidelity an enforceable entitlement to receive gold coin or bullion but instead could be satisfied through the delivery of 2,500 tons of rock ("gold ore").

14. STERN never invested Nagiel's money in gold or in a gold certificate. Rather, STERN deposited Nagiel's $250,000 check into his personal bank account and spent the money on a variety of expenses.

15. In or about February, 1998, Nagiel telephoned Sugar to inquire about her $250,000 "gold" investment. In connection with that inquiry, on or about February 12, 1998, Nagiel faxed to Sugar a copy of Sugar's June 24, 1997 letter.

16. Neither Sugar nor STERN returned Nagiel's $250,000 "gold" investment to her in February or March, 1998. STERN also failed to return to Nagiel in February or March, 1998 the $200,000 that Nagiel had given him to invest in the BayBank fund.

17. In or about March, 1998, Nagiel filed a civil lawsuit against STERN seeking the return, inter alia, of the $450,000 that she had given to him to invest in the BayBank fund and in the gold investment. Thereafter, the United States commenced a criminal investigation of STERN's financial transactions with Nagiel.

18. On or about August 6, 1998, agents from the Federal Bureau of Investigation ("FBI") interviewed STERN concerning his dealings with Nagiel.

19. In or about December, 1998, STERN entered into a settlement agreement with Nagiel pursuant to which he agreed to repay the money that Nagiel had given to him. At the time that STERN entered into the settlement agreement, Nagiel had obtained judicial attachments and liens against STERN's personal residence and bank accounts. In addition, STERN was aware of the FBI's investigation.

**COUNTS ONE through SIXTEEN**

**(Mail Fraud - 18 U.S.C. § 1341)**

20. The Grand Jury re-alleges and incorporates by reference paragraphs 1-19 of this Indictment and further charges that:

21. On or about the dates set forth below, in the District of Massachusetts and

elsewhere, the defendant DAVID G. STERN, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing and attempting to do so, did cause persons to place in post offices and authorized depositories for mail matter, matters and things to be sent and delivered by the United States Postal Service or by private or commercial carrier, and caused to be deposited matters and things to be sent or delivered by the United States Postal Service or by a private or commercial interstate carrier, and took and received therefrom, such matters and things, and knowingly caused to be delivered by the United States Postal Service mail or by private or commercial carrier according to the directions thereon, such matters and things, as follows:

| Count | Date | Mailing |
|---|---|---|
| 1 | 9/16/96 | Check to Dvorah Nagiel in the amount of $3,750 |
| 2 | 10/7/96 | Check to Dvorah Nagiel in the amount of $1,250. |
| 3 | 11/12/96 | Check to Dvorah Nagiel in the amount of $1,250. |
| 4 | 12/9/96 | Check to Dvorah Nagiel in the amount of $2,500 |
| 5 | 2/5/97 | Check to Dvorah Nagiel in the amount of $2,500 |
| 6 | 3/19/97 | Check to Dvorah Nagiel in the amount of $2,500 |
| 7 | 5/8/97 | Check to Dvorah Nagiel in the amount of $2,500. |
| 8 | 6/11/97 | Check to Dvorah Nagiel in the amount of $2,500 |
| 9 | 7/28/97 | Check to Dvorah Nagiel in the amount of $1,250. |
| 10 | 8/11/97 | Check to Dvorah Nagiel in the amount of $2,500 |
| 11 | 9/19/97 | Check to Dvorah Nagiel in the amount of $2,500 |
| 12 | 11/18/97 | Check to Dvorah Nagiel in the amount of $1,250. |
| 13 | 1/13/98 | Check to Dvorah Nagiel in the amount of $2,500. |

| | | |
|---|---|---|
| 14 | 2/13/98 | Check to Dvorah Nagiel in the amount of $1,250. |
| 15 | 3/4/98 | Check to Dvorah Nagiel in the amount of $2,500 |
| 16 | 6/24/97 | Letter from Alan Sugar to Dvorah Nagiel |

All in violation of Title 18, United States Code, Section 1341 and Title 18, United States Code, Section 2.

**COUNTS SEVENTEEN and EIGHTEEN**

**(Wire Fraud - 18 U.S.C. § 1343)**

22. The Grand Jury re-alleges and incorporates by reference paragraphs 1-19 of this Indictment and further charges that:

23. On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendant DAVID G. STERN, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, as follows:

| Count | Date | Wire Communication |
|---|---|---|
| 17 | 6/24/97 | Telephone call from STERN in Massachusetts to Alan Sugar in North Carolina regarding letter to Dvorah Nagiel |
| 18 | 2/12/98 | Facsimile from Dvorah Nagiel in Massachusetts to Alan Sugar in North Carolina regarding 6/24/97 letter to Nagiel. |

All in violation of Title 18, United States Code, Section 1343 and Title 18, United States Code, Section 2.